**Thomas T. Booth, Jr., Esquire**
**LAW OFFICES OF THOMAS T. BOOTH, JR., LLC**
**241 Kings Highway East, First Floor**
**Haddonfield, New Jersey 08033**
**Tel:    (856) 354-6060**
**Fax:    (856) 354-6033**

**Michael J. DeBenedictis, Esquire**
**DEBENEDICTIS & DEBENEDICTIS, LLC**
**41 South Haddon Avenue**
**Haddonfield, New Jersey 08033**
**Tel:    (856) 795-2101**
**Fax:    (856) 795-0893**
**Attorney for Plaintiffs**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| VICTOR & KATHLEEN OPPERMAN, h/w &<br>INEZ MURRAY, by and through Terry<br>Maxwell, on behalf of themselves and<br>all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>ALLSTATE NEW JERSEY INSURANCE<br>COMPANY, TOM LEONARD,<br>and JOHN  DOES 1-10,<br><br>Defendants. | CIVIL ACTION NO. 07-cv-1887<br>(RMB/JS)<br><br><br><br><br><br>**FIRST AMENDED COMPLAINT** |

     Victor and Kathleen Opperman, Plaintiffs residing at 815 Sylvania Avenue, Folsom, Pennsylvania 19033, and Inez Murray, Plaintiff residing at 2210 Belmont Avenue, Philadelphia, Pennsylvania 19131, by way of Complaint against the Defendants state:

     1.     Plaintiffs, Victor and Kathleen Opperman (hereinafter "the Oppermans"), are individuals who are husband and wife and who, at all relevant times herein were the owners of 962 Ashburn Way, Woolwich, New Jersey (the "Property"), and all contents therein, where they resided with their two, natural minor children.

2.      Plaintiff Inez Murray, is an individual who at all relevant times herein was the owner and resident of 160 Ernest Garton Road, Bridgeton, New Jersey

3.      Terry Maxwell, residing at 1235 N. Sunnyvale #61, Mesa, Arizona 85205, is the natural son of Inez Murray, and possesses the legal authority to initiate and maintain this suit on behalf of his principal and the real party-in-interest, Inez Murray, via a validly executed, and current, power of attorney.

4.      Defendant, Allstate New Jersey Insurance Company (hereinafter "ANJIC" or "Allstate"), at all relevant times herein, upon information and belief, is a corporation or other fictitious entity licensed to and engage in the business of issuing policies of insurance to persons such as the Plaintiffs, and maintaining a principal place of business at P.O. Box 789, Brock, New Jersey 08732 and is the largest publicly-held personal lines insurer in the United States.

5.      The Home Depot, Inc. (hereinafter individually, and together with Home Depot U.S.A., Inc., "Home Depot") is the world's largest home improvement retailer and the second largest retailer in the United States, based on net Sales for the fiscal year ended January 29, 2006. Home Depot operates approximately 2,042 stores, most of them under The Home Depot brand name.

6.      The Home Depot, Inc., is a Delaware corporation, with its principal place of business located at 2455 Paces Ferry Road, N.W., Atlanta, Georgia 30339.  At all times relevant herein, Home Depot was the parent company of Home Depot U.S.A., Inc. and licensed to do and actually engaged in business within the State of New Jersey.

7.      Upon information and belief, Home Depot U.S.A. is a Delaware corporation, a wholly owned subsidiary of The Home Depot Inc., and at all times relevant herein was licensed to do and actually engaged in business within the State of New Jersey.

8.      Upon information and belief, Home Depot U.S.A. Inc., was and is the operating subsidiary of Home Depot branded stores located in the United States in general, and New Jersey in specific.  Home Depot currently maintains 60+ of these stores within this State.

9.      Defendant, Tom Leonard (hereinafter "Leonard"), upon information and belief is an individual whose address is unknown to the Plaintiffs and who, at all relevant times herein, was an employee of Defendant, Allstate and was acting in that capacity.

10.     Defendants, John Does 1-10 are individuals whose identity is presently unknown to Plaintiffs who are corporate officers of Allstate and Home Depot.

### INEZ MURRAY FACTS

11.     At all relevant times herein, Inez Murray owned and resided at 160 Ernest Garton Road, Bridgeton, NJ 08302.

12.     At all relevant times herein, Defendant Allstate New Jersey Insurance Company insured Inez Murray under a homeowner's policy of insurance, insuring against certain perils at her residence more particularly Policy No. 9261284

13.     On or about February 11, 2004, there was a sudden and accidental fire, a covered peril under the aforesaid policy of insurance issued by Defendant at Inez Murray's residence at 160 Ernest Garton Road, Bridgeton, NJ.

14.     Thereafter, Inez Murray presented a claim for insurance coverage for covered losses as a result of the fire to Defendant ANJIC, which losses included losses sustained to her dwelling, a structure covered by the aforesaid policy of insurance.

15.     Defendant ANJIC assigned Defendant Tom Leonard the claim filed by Inez Murray for handling.

16.     Defendant Leonard presented an estimate to Inez Murray dated March 18, 2004 in the amount of $116,785.01 Replacement Cost Value, $100,207.73 Actual Cash Value.

17.     Mr. Maxwell, her son, also received a copy of the estimate prepared by Mr. Leonard.

18.     The estimate contained a reference to Home Depot materials pricing.

19.     Inez Murray received policy proceeds from ANJIC on her dwelling loss as reflected in Defendant Leonard's estimate.

20.     The amount paid by ANJIC to Inez Murray did not provide Murray with sufficient funds to replace her dwelling losses.

21.     Inez Murray, being unable to rebuild the dwelling with the amount of money paid by ANJIC under the claim, was forced to sell the land.

22.     Since the fire, Inez Murray has subsequently become disabled, and Terry Maxwell, her natural son, has authority through a Power of Attorney to bring and prosecute legal matters on behalf of his mother, and brings this action pursuant thereto for real party-in-interest Inez Murray.

3

## OPPERMAN FACTS

23.     Defendant, Allstate issued a policy of insurance, Policy No.: 909160071, to the Oppermans for the Property and its contents, which policy was in full force and effect on June 6, 2004, and at all times herein.

24.     On June 6, 2004, there was a sudden and accidental fire at the Property, destroying and/or seriously damaging the building and its contents.

25.     The Oppermans immediately presented a claim to Allstate under the aforesaid policy of insurance and Allstate acknowledged the claim and accepted coverage for the loss.

26.     The Oppermans retained the services of The Major Group, Inc., (hereinafter "TMG") to represent them in the adjustment of the loss.

27.     TMG's representative, Jeffrey Major, a licensed public adjuster in the State of New Jersey, contacted the Allstate representative assigned to this loss, Defendant Leonard, and arranged to meet Leonard at the Property on June 9, 2004.

28.     Leonard met Jeffrey Major at the Property on June 9, 2004 and the Property, in its entirety, including the building and all contents was exhibited for Leonard's inspection.

29.     At the June 9, 2004 meeting, Jeffrey Major presented Leonard with an estimate of building damages on the loss which was prepared by Jeffrey Major, which estimate totaled $182,677.99 replacement cost value and $175,009.27 actual cash value.

30.     Hearing nothing from Leonard for some time, Jeffrey Major corresponded to Leonard on or about July 24, 2004, reminding Leonard it had been over 30 days since the building estimate had been submitted, and Allstate hadn't replied or submitted an estimate to Jeffrey Major or Opperman, as well as the fact that time was of the essence due to the limited additional living expense benefit of 9 months available to Opperman under the aforesaid Allstate policy.

31.     Under cover of letter dated August 3, 2004, Jeffrey Major again corresponded to Leonard, advising that over 45 days had then passed from the time of submission of the Opperman's building loss and again advising that time was of the essence.

32.     Leonard's written estimate of August 5, 2004 was for $108,322.60 replacement cost value, and $104, 673.30 actual cash value, and which bore a notation on p.21 indicating that Home Depot prices had been used in calculating material costs.

4

33.     The August 5, 2004 estimate of Leonard was defective in many respects; the defects including missing items, unit costs which were grossly undervalued and the fact that there were no known builders who would perform the necessary repair work for Leonard's cost, and scope items which Leonard refused to address (for example, making an allowance for a bathtub replacement, but failing to make an allowance for installing the new bathtub, which could not possibly fit through the existing doorframe).

34.     Jeffrey Major returned to the loss site on August 9, 2004 with the builder who was consulting with him on this loss, and prepared a comprehensive list of differences and defects in Leonard's estimate.

35.     Jeffrey Major corresponded to Leonard on August 10, 2004, indicating the differences in scope and pricing between the two estimates, and requesting a builders meeting to further review the loss and scope of repairs.

36.     In a telephone conversation with Jeffrey Major on or about August 10, 2004, Leonard refused to adjust his figures or even discuss the scope or differences between the two estimates, and refused to reveal anything further with regard to how he arrived at his estimate for the loss. Instead, Leonard requested Jeffrey Major submit a list of differences and then demanded that the matter be submitted for appraisal.

37.     Opperman then retained counsel, who wrote to Leonard directly on August 21, 2004, and advised Leonard that his actions may be in bad faith, and demanding the names and addresses of reputable builders who would be willing to repair the Opperman's home for the prices quoted by Leonard in his estimate.

38.     In response thereto, under cover of letter dated August 20, 2004, Leonard demanded appraisal of the building loss without ever even attempting to address the issues.

39.     On September 8, 2004, Leonard sent to Opperman's counsel a draft in the amount of the undisputed actual cash value of the loss according to Leonard, and then again demanded appraisal of the building loss.

40.     On September 29, 2004, the Opperman's counsel responded to Leonard's demand for appraisal by advising that the scope of the loss had been agreed upon, therefore appraisal was unable to take place.  Counsel also requested details on the Home Depot pricing allegedly used by Leonard in calculating his estimates.

41.     On September 30, 2004, Warren K. Harrison of Defendant, Allstate's "Special Investigations Unit" wrote the Oppermans directly requesting a statement.

42.     Opperman's counsel wrote to Leonard again on October 7, 2004 enclosing a copy of an estimate from Legacy Construction Company for the repairs to the Oppermans' home, and again requesting the names of any reputable builders who could repair the Opperman's home for the estimate prepared by Leonard.  Counsel also inquired as to the curious timing of the SIU letter and request for a statement.

43.     Thereafter, in October 2004, the Oppermans' counsel was then contacted by an independent investigator retained by Allstate requesting a recorded statement and tax returns for the last 3 years regarding their contents claim.

44.     On October 7, 2004 counsel for the Oppermans wrote to Leonard and requested the names of any reputable builder who would agree to rebuild the Plaintiffs' home for the amount of the damage estimated by Leonard.

45.     Leonard never informed the Plaintiffs that any reputable builder would rebuild their home for the amount contained in his estimate.

46.     On October 22, 2004, counsel named Charles Crook as Plaintiffs' appraiser and so informed Allstate and Leonard.

47.     The Oppermans appeared and gave a statement under oath at the request of Allstate on December 23, 2004, and cooperated in every material respect in all requests of Leonard and Allstate in a timely fashion.

48.     Allstate named its appraiser and the loss on the dwelling proceeded to appraisal, with an appraisal award of $145,532.37 entered on or about February 27, 2005.

49.     Insofar as Plaintiffs' additional living expense (hereinafter "ALE") coverage was for a voluntarily extend the additional living expense an additional (4) months to account for the delay occasioned by Leonard submitting an estimate which was deficient and low, and the fact that Allstate, relying upon such estimate, had forced Plaintiffs' dwelling claim into appraisal, after refusing to negotiate in good faith on the claim.

50.     On or about March 8, 2005, Leonard corresponded to Plaintiffs' counsel declining to extend ALE beyond March 2005, starting that nine months were all they were entitled to and that the delays in the claim were caused by the Plaintiffs, not Allstate.

51.     Counsel for Plaintiffs wrote to Leonard on March 15, 2005, requesting Leonard and Allstate reconsider their position on the extension of ALE issue.

52.     Leonard responded to counsel's request for reconsideration on March 22, 2005 and indicated his supervisor, Laurie Donohue had reviewed the request and agreed with Leonard's decision to decline the ALE.

53.     Plaintiffs had visited Home Depot in the fall of 2004 and could not find any Home Depot employee with any information regarding any "special pricing for Allstate insureds." None of the pricing offered by Home Depot matched the prices on Leonards estimate and were, in fact, much higher.

## GENERAL FACTS

54.     Upon information and belief, Home Depot endorsed, approved, and/or consented to the use of its name, logo and pricing by Allstate in the preparation of its estimates.

55.     Allstate had the apparent authority to use and/or do the same.

56.     Upon information and belief, Home Depot and Allstate both benefit from this arrangement and representation.

57.     Home Depot and Allstate each have an obligation to insure that the pricing database was and is, complete, accurate and current.

58.     Home Depot and Allstate know, or should have known, that the pricing was, and is, in fact, neither current, nor accurate.

59.     The use of the Home Depot brand name, the association of the prices with a nationally recognized chain, and the manner of presentation of the estimate, among other things, are designed to, intend to, and operate to add an additional air of legitimacy and reliability to Allstate's estimates, and are intended to induce, and do in fact operate to induce, a reliance thereon.

60.     In addition to any individual claims, Plaintiffs bring this action pursuant to NJ Court Rule 4:32-(a) and 4:32-1(b) of the New Jersey Rules of Civil Procedure on behalf of a Class (the "Class") consisting of all persons, natural or otherwise, who had made claims under an Allstate-issued policy, and received estimates for their building or dwelling losses containing the representation that the pricing was based upon Home Depot pricing.

7

61.     Excluded from the Class are the Defendants, their affiliates, successors and assigns, officers and directors, and members of their immediate families.

62.     The proposed Class is no numerous that joinder of all members is impracticable. While the precise number of members in the Class is not known to the named Plaintiff at present, it is believed that thousands of estimates were prepared using the Purported "Home Depot Pricing Database."

63.     There are questions of law and fact that are common to the Class, including, but not limited to, the following:

    a.     Whether or not Home Depot and Allstate had an agreement to use a particular Home Depot supplied pricing database;

    b.     Whether or not Allstate had the actual or apparent authority to represent that the pricing was supplied by Home Depot;

    c.     Whether or not Home Depot and/or Allstate incurred obligations to the class;

    d.     Whether or not Home Depot and/or Allstate breached obligations to the class;

    e.     Whether or not Home Depot and/or Allstate insured the accuracy or completeness of the database;

    f.     Whether or not Home Depot and/or Allstate should be enjoined from further use of the Home Depot pricing database as it has been, or it is currently being, utilized; and

    g.     Whether or not Home Depot and/or Allstate performed the required maintenance to keep the database up-to-date.

64.     The class claims of the representative parties are typical of the claims of the Class in that they were Allstate's insureds provided with an estimate purportedly based upon the Home Depot pricing, when, in fact, the pricing was not accurate.  Simply put, they suffered property damage representative of all other members of the proposed class and then received an estimate predicated on the same facts as all other members of the class.  In other words, with respect to the class allegations, the representative parties were subject to the exact same business practices and written representations.

65.     The representative parties will fairly and adequately protect the interests of the Class.

8

66.     Representative parties have demonstrated their commitment to the case, have diligently educated themselves as to the issues involved, and to the best of their knowledge do not have any interests adverse to the proposed class.

67.     The question of law and fact common to the members of the class predominate over any questions affecting only individual members.

68.     A class action is superior to other available methods for a fair and efficient adjudication of this controversy as many members of the proposed class have damages arising from Defendant's wrongful course of conduct which would not be susceptible to individualized litigation of this kind, including, but not limited to, the costs of experts and resources that may be required to examine the business practices in question.

69.     Given the relative size of damages sustained by the individual members of the Class, the diffuse impact of the damages, and homogeneity of the issues, the interests of members of the Class individually controlling the prosecution of separate actions is minimal.

70.     There is no litigation already commenced, nor is there anticipated to be subsequent litigation commenced by other members of the Class concerning the Defendant's alleged conduct.  Consequently, concerns with respect to the maintenance of a class action under New Jersey law regarding the extent and nature of any litigation already commenced by members of the Class are non-existent.

71.     Few, if any, unique or significant difficulties are likely to be encountered in the management of a Class action pursuant to New Jersey Court Rules.  Each class member is readily identifiable, there are established community communication networks, the Class is well defined, and the event is localized.

## COUNT ONE

### (Bad Faith v. Allstate)

72.     Plaintiffs incorporate by reference the preceding paragraphs of the Complaint as though fully set forth herein.

73.     At all relevant times herein, Allstate had an obligation to deal in good faith and fairly with the Plaintiffs, its insured.

74.     Allstate breached its obligations of good faith an fair dealing to the representative plaintiff(s) in one or more of the following ways:

9

a.   failing to pay  claim within a reasonable time within which the claim had been submitted;

b.   failing to promptly investigate the claim, make determinations as to coverage, and advise  of the decision;

c.   refusing to effectuate a prompt, fair settlement in good faith;

d.   preparing a grossly negligent or fraudulent estimate of damages and attempting to use the estimate to negotiate a settlement of the claim more favorable to Allstate;

e.   failing and refusing to provide  the basis for the Allstate's estimate;

f.   failing to acknowledge and act reasonably upon communication with respect to the claim;

g.   knowingly, intentionally, willfully and/or recklessly generating a grossly undervalued estimate of repairs through the omission and/or mischaracterization of the necessary repair operations and/or misuse of claims estimating software and/or the representations provided therewith.

h.   such other bad faith conduct as may be revealed throughout the course of discovery.

75.   No valid and/or debatable reason exists for Allstate's denial and/or delay in payment of  the claim (s).

76.   Allstate's conduct in fabricating en estimate which has no good faith basis in actual cost to repair or replace the Plaintiff(s)' home(s) in accord with the policy provisions in egregious, intolerable and outrageous.

77.   Allstate's conduct is in violation of N.J.S.A. 17:29B-4 et seq. and N.J.S.A. 17B:30-13 et seq., known as Unfair Claims Settlement Practices Act.

78.   Allstate's conduct is in violation of N.J.A.C. 11:2-17.7.

79.    Plaintiffs have been damaged as a direct result of Allstate's conduct.


**WHEREFORE**, Plaintiff demands judgment against Defendant Allstate for damages, punitive damages, attorney's fees, interest, costs of suit and such other relief as the court may deem proper under the circumstances.

## COUNT TWO

### (Consumer Fraud)

80.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

81.     Defendants' conduct is in violation of the Consumer Fraud Act, N.J.S.A. 56:8-1 et seq., and N.J.S.A. 13:45A-16.2 insofar as defendants knowingly misrepresented and/or concealed, suppressed and omitted material facts, and such other conduct as set forth above and as further discovery may reveal, with the intent that Plaintiffs rely upon such misrepresentation, concealment, suppression and omission in connection with the adjustment of the aforesaid loss.

82.     Plaintiffs have sustained damages and an ascertainable loss as a result of Defendants' conduct.

**WHEREFORE**, Plaintiff demands judgment against the Defendants individually, jointly and/or severally for damages, treble damages, attorneys fees, interest, costs of suit, and such other relief as the court may deem proper under the circumstances.

## COUNT THREE

### (Aiding Commission of a Tort/Conspiracy to Commit Tort)

83.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

84.     The actions of Defendants and Home Depot represent a common plan, confederation, agreement or design to commit a tort upon Plaintiffs by active participation, aid, encouragement, and/or ratification of the wrong done for Defendant.

85.     Plaintiffs have been caused to sustain damages as a direct and proximate result of Defendants' actions.

**WHEREFORE**, Plaintiff demands judgment against the Defendants individually, jointly and/or severally for damages, treble damages, attorneys fees, interest, costs of suit, and such other relief as the court may deem proper under the circumstances.

## COUNT FOUR

### (Corporate Officer Liability v. John Does 1-10)

86.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

87.     At all relevant times herein, Defendants, John Does 1-10 were acting in their capacity as corporate officers of Defendants Allstate and Home Depot.

88.     Defendants Allstate and Home Depot owed a duty of care to Plaintiffs, which duty of care it delegated to Defendants, John Does 1-10.

89.     Defendants, John Does 1-10 breached the duty of care owed to Plaintiffs.

90.     Plaintiffs were caused to sustain damages as a direct and proximate result of the breach by Defendants, John Does 1-10.

**WHEREFORE**, Plaintiff demands judgment against the Defendants individually, jointly and/or severally for damages, treble damages, attorneys fees, interest, costs of suit, and such other relief as the court may deem proper under the circumstances.

## COUNT FIVE

### (Agency)

91.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

92.     At all relevant times herein, Defendant, Leonard and/or John Does 1-10 were acting in their capacity as agent, servant and/or employees of Defendant Allstate and or Home Depot.

93.     Defendants are vicariously liable over to the Plaintiffs for the actions of their agents, servants and/or employees.

**WHEREFORE**, Plaintiff demands judgment against the Defendants individually, jointly and/or severally for damages, treble damages, attorneys fees, interest, costs of suit, and such other relief as the court may deem proper under the circumstances.

DATED: April 24th , 2009     **LAW OFFICES OF THOMAS T. BOOTH, JR., LLC**
                                Attorneys for Plaintiff

                                By: /s/ Thomas T. Booth, Jr
                                    Thomas T. Booth, Jr., Esquire

## CERTIFICATION OF NO OTHER ACTIONS

Pursuant to R.4:5-2, it is hereby stated that the matter in controversy is not the subject to any other action pending in any other Court or of a pending arbitration proceeding to the best of my knowledge and belief.  Also, to the best of my knowledge and belief, no other action or arbitration proceeding is contemplated.  Further, other than the parties set forth in this pleading, I know of no other parties that should be joined in the above action.  In addition, I recognize the continuing obligation of each party to file and serve on all parties and the Court an amended certification if there is a change in the facts stated in this original certification.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues.

## DESIGNATION OF TRIAL COUNSEL

Thomas T. Booth, Jr., Esquire is designated as trial counsel.

## CERTIFICATION OF MAILING TO NEW JERSEY ATTORNEY GENERAL

I hereby certify that a copy of this Complaint was sent via First Class U.S. Mail to the Attorney General of the State of New Jersey.

**LAW OFFICES OF THOMAS T. BOOTH, JR., LLC**
Attorneys for Plaintiffs


DATED: April 24th , 2009        By:    /s/ Thomas T. Booth, Jr.      .
                                       Thomas T. Booth, Jr., Esquire