NOT FOR PUBLICATION                    [Dkt. Ents. 179, 183, 190]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

---

|  |  |
|---|---|
| VICTOR OPPERMAN, et al., | |
| Plaintiffs, | |
| v. | Civil No. 07-1887 (RMB/JS) |
| ALLSTATE NEW JERSEY INSURANCE COMPANY, et al., | **OPINION** |
| Defendants. | |

---

Appearances:

Michael John DeBenedictis
DeBenedictis & DeBenedictis LLC
20 Brace Road, Suite #350
Cherry Hill, NJ 08034

Thomas T. Booth, Jr.
Law Offices of Thomas T. Booth, Jr., LLC
129 W. Evesham Road
Voorhees, NJ 08043

         Attorneys for Plaintiffs

Steven Gerber
Mary Patricia Gallagher
Adorno & Yoss, LLP
155 Willowbrook Boulevard
Wayne, NJ 07470

         Attorneys for Defendants.

**BUMB**, UNITED STATES DISTRICT JUDGE:

        In this putative class action, plaintiffs Victor Opperman,

Kathleen Opperman, and Inez Murray (collectively, the

1

"Plaintiffs") allege that defendants Allstate New Jersey Insurance Company ("Allstate")[1] and Tom Leonard (collectively, the "Defendants") systematically undervalued and underpaid homeowners insurance claims by using software systems and cost databases that produced depressed estimates, in violation of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1.  Plaintiffs Victor and Kathleen Opperman, after receiving an undervalued estimate of their loss, successfully disputed the estimate and ultimately recovered the full value.  Plaintiff Inez Murray, by contrast, merely received the undervalued payment without dispute.

This matter now comes before the Court upon Plaintiffs' motion for class certification, pursuant to Federal Rule of Civil Procedure 23, as well as Defendants' motion to seal certain exhibits, pursuant to Local Civil Rule 5.3(c).  For the reasons stated herein, the Court will deny both motions.

### BACKGROUND

Plaintiffs Victor and Kathleen Opperman, Allstate homeowners insurance polcyholders, filed a claim for damage to their house caused by an accidental fire on June 6, 2004.  Two months later, on August 5, 2004, Defendant Tom Leonard, an Allstate agent,

---

[1] Although this Opinion will, for simplicity, refer to Defendant Allstate New Jersey Insurance Company as "Allstate", the Court recognizes that said defendant is a wholly owned subsidiary of the legally distinct corporate entity Allstate Insurance Company.  (Pl.s' Br. 1, n.1.)

2

produced a written estimate of the claim for $108,322.60 replacement cost value and $104,673.30 actual cash value.  The estimate noted that Home Depot prices had been used in calculating material costs.  Plaintiffs Victor and Kathleen Opperman challenged Allstate's proposed award, which they believed was unreasonably low, with help from their agent Jeffrey Major, a licensed public adjustor, as well as their attorney Thomas Booth.  Their dispute with Allstate culminated in a third-party appraisal of the loss, resulting in an appraisal award of $145,532.37, which was entered on February 27, 2005.  The Oppermans then hired a contractor to repair their house for $145,001.86, which Allstate paid in full.  The Oppermans allege, however, that they incurred four months of additional living expenses as a consequence of the delay caused by Defendants' deficient estimate and subsequent refusal to negotiate the claim in good faith.  Defendants dispute their fault for the delay and thus never paid the resulting expenses.[2]

Plaintiff Murray, also an Allstate homeowners insurance policyholder, filed a similar claim for fire-damage to her home, which occurred on February 11, 2004.  Five weeks later, on March 18, 2004, Defendant Leonard produced an estimate of the loss at $116,785.01 replacement cost value and $100,207.73 actual cash

---

[2] Plaintiffs Victor and Kathleen Opperman sold their house in September 2004 for $310,000, having purchased it two years earlier for $225,000.

3

value, which also cited Home Depot materials pricing.  Plaintiff

Murray accepted payment based upon the estimate for a total of

$100,457.73,[3] but, allegedly unable to rebuild her home for the

paid amount, she sold the property.  Allstate had repeatedly

informed Plaintiff Murray that she could dispute its estimate.

The bottom of the estimate itself and a document accompanying the

settlement check, which was sent five months after the estimate,

contained information regarding how to dispute the estimate.[4]  In

fact, Ms. Murray apparently knew that the Allstate estimate was

low, as she (with the help of her daughter Joan Rudd) had

retained Jeffrey Major, the same licensed public adjustor whom

Plaintiffs Victor and Kathleen Opperman had retained.  Although

Mr. Major produced an estimate significantly higher than

Allstate's, Plaintiff Murray nonetheless declined to dispute the

---

[3] The parties did not explain why the payment exceeded the
estimate by $250.

[4] The estimate document reads, in relevant part, "If you
find the cost of repairs or replacement is more than reflected in
this estimate, please contact your claim adjuster at the number
listed above."  (Murray Estmt. at 16 [Def.s' Ex. 16].)  The
document accompanying the settlement check reads, in relevant
part, "YOUR POLICY CONTAINS BUILDING REPLACEMENT COST COVERAGE.
WHEN THE WORK IS COMPLETED, YOU MAY MAKE [A] CLAIM FOR THIS
EXTENSION OF COVERAGE WITHIN **180** DAYS AFTER YOUR LOSS. . . . IF
THE FULL COST ALLOWED FOR REPAIR OR REPLACEMENT IS FOUND TO BE
INSUFFICIENT YOU **MUST** CONTACT ALLSTATE TO DISCUSS ANY
SUPPLEMENTAL CLAIMS **BEFORE** REPAIRS ARE INITIATED."  (Leonard
Letter, August 31, 2004, at 2 [Def.s' Ex. 15].)

4

Allstate calculations.[5]  Plaintiff Murray, who is elderly, has become cognitively impaired since 2004, but her son Terry Maxwell has brought this action on her behalf as holder of her power-of-attorney.

Plaintiffs now seek certification of a class of similarly situated Allstate policyholders who received deficient estimates to settle their claims.  Plaintiffs allege that between January 1, 2000 and December 31, 2004, Allstate engaged in improper estimating practices to underpay claims.

To understand Plaintiffs' allegation, one must first know that claims are calculated using the "total component method", sometimes called a "stick and stone" approach, in which every discrete operation required to repair a dwelling to its pre-loss condition is first broken into its most elemental parts, then each part is assessed for the cost value of labor and materials in the local market, and finally the costs are compiled into an estimate.  Plaintiffs allege that Allstate manipulated this procedure in two ways.  First, Plaintiffs aver, Allstate altered its cost databases so that estimates would be calculated based

---

[5] It is not known why Plaintiff Murray, armed with the knowledge that the Allstate estimate was low, declined to dispute it.  It is quite possible that she simply did not want to be troubled with the burdens of raising a dispute, and that she was content to take the substantial sum paid to her and walk away from the house.  In light of her own failing health and the death of her daughter, Plaintiff Murray may have made a considered decision that quarreling with an insurance company would not be a fruitful use of her time and energy.

upon Home Depot materials prices that were neither accurate nor generally available in the local marketplace.[6]  The price discrepancies were largely attributable to difficulties in mapping Home Depot prices onto the preexisting price database, requiring such modifications as: (a) using Home Depot prices for "core" materials (which comprise the item being replaced), while using the preexisting (non-Home Depot) prices for "supporting" materials like nails and screws; (b) substituting materials in the preexisting database with lower-quality Home Depot materials; and (c) averaging certain regionally variable Home Depot prices. Second, Plaintiffs aver, Allstate manipulated estimates for its larger (multi-room) claims by omitting an entire category of repair operations -- so called "remove" operations -- calculating only replacement costs while excluding the cost of removing damaged items being replaced; then accounting for this omitted category by including a single undervalued guess of all remove operations together.

---

[6] Plaintiffs' allegation that the Home Depot prices were not generally available in the marketplace is confusing.  Defendants apparently replaced much of their preexisting database of prevailing market prices with lower Home Depot prices. Plaintiffs do <u>not</u> allege that the Home Depot prices that were input into the revised database were not available to Home Depot patrons.  Rather, Plaintiffs' allegation seems to be two-fold. First, the Home Depot prices were themselves lower than the market average.  And second, as a result of the difficulties in mapping Home Depot prices onto the preexisting database, a final estimate might not accurately reflect the aggregate costs to a customer shopping at a local Home Depot store of all materials required to repair his loss.

Plaintiffs contend that the collateral effect of these estimating practices was the systematic undervaluation and underpayment of claims.  Accordingly, they seek to represent two classes covering the 2000 to 2004 period: first, a class of all Allstate insureds who received an estimate of loss based upon Home Depot pricing; and second, a subclass of those whose estimates failed to include a corresponding "remove" operation for every "replacement" operation.

## LEGAL STANDARD

Class certification is governed by Federal Rule of Civil Procedure 23.  To be certified, "a class must satisfy the prerequisites of Rule 23(a) and the 'parties seeking certification must also show that the action is maintainable under Rule 23(b)(1), (2), or (3).'" Barnes v. American Tobacco Co., 161 F.3d 127, 140 (3d Cir. 1998) (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614 (1997)).  The party seeking class certification bears the burden of proving that each of the Rule 23 requirements has been met.  Baby Neal v. Casey, 43 F.3d 48, 55 (3d Cir. 1994).

The district court must perform "a rigorous analysis" to satisfy itself that the strictures of Rule 23 have been met. Beck v. Maximus, Inc., 457 F.3d 291, 297 (3d Cir. 2006). Although class certification is a matter subject to the district court's discretion, "proper discretion does not soften the rule

[that] a class may not be certified without a finding that each Rule 23 requirement is met." In re Hydrogen Peroxide Antitrust Litigation, 552 F.3d 305, 310 (3d Cir. 2008). However, courts within the Third Circuit are instructed to construe Rule 23 liberally. Eisenberg v. Gagnon, 766 F.2d 770, 785 (3d Cir. 1985) ("[T]he interests of justice require that in a doubtful case . . . any error, if there is to be one, should be committed in favor of allowing a class action.").

## DISCUSSION

### A. Rule 23(a) Requirements

Before a class may be certified, the requirements of Federal Rule of Civil Procedure 23(a) must be met. Fed. R. Civ. P. 23(a). Rule 23(a) contains four elements: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.[7] The Court will discuss each in turn.

### 1. Numerosity

The numerosity element requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a). "To meet the numerosity requirement, class

---

[7] The exact language of Rule 23(a) provides: "One or more members of a class may sue or be sued as representative parties on behalf all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of th class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

representatives must demonstrate only that 'common sense'
suggests that it would be difficult or inconvenient to join all
class members." In re Prudential Ins. Co. of America Sales
Practices Litigation, 962 F. Supp. 450, 510 (D.N.J. 1997).
Defendants do not contest that this case fulfills the numerosity
requirement.  (Def.s' Opp'n Br. 22.)  As Allstate adjusted on
average more than 10,000 dwelling loss claims annually during the
four-year class period, (Cherewich Dep., Mar. 6, 2009, 47:6-25
[Pl.s' Ex. 63]), each of which adjustments used the Home Depot
pricing scheme, the numerosity element is easily satisfied here.
See Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001)
("[G]enerally if the named plaintiff demonstrates that the
potential number of plaintiffs exceeds 40, the first prong of
Rule 23(a) has been met.").  Accordingly, the numerosity
requirement does not present an impediment to class
certification.

### 2. Commonality

The second prerequisite to class certification is
commonality, which requires that there be "questions of law or
fact common to the class."  Fed. R. Civ. P. 23(a).  This does not
mean that all the factual and legal questions in the case must be
identical for all proposed class members.  Rather, "[t]he
commonality requirement will be satisfied if the named plaintiffs
share at least one question of fact or law with the grievances of

the prospective class." <u>Baby Neal</u>, 43 F.3d at 56.  Because the

commonality requirement "is easily met," <u>id.</u> (citing H. Newberg &

A. Conte, 1 <u>Newberg on Class Actions</u> § 3.10, at 3-50 (1992)),

Defendants do not contest that it is satisfied in this case.

(Def.s' Opp'n Br. 22.)  Indeed, obvious questions of fact common

to all class members include: (1) whether Allstate artificially

depressed its dwelling loss claims estimates by utilizing Home

Depot materials pricing; (2) whether the estimates produced by

Allstate accurately reflected available market prices; and (3)

whether Allstate underpaid dwelling losses by utilizing Home

Depot materials pricing.  Additionally, whether Allstate's

conduct in producing depressed estimates violated the New Jersey

Consumer Fraud Act presents a central question of law that is

common to all class members.  The Court need not discuss here

"the existence of individualized issues in [the] proposed class

action," because such individualized issues, if they exist, "do[]

not per se defeat commonality."  <u>Brooks v. Educators Mut. Life</u>

<u>Ins. Co.</u>, 206 F.R.D. 96, 101 (E.D. Pa. 2002) (citing <u>Johnston v.</u>

<u>HBO Film Mgt., Inc.</u>, 265 F.3d 178, 191 (3d Cir. 2001)).

Accordingly, the commonality requirement is satisfied in this

case.

### 3.  Typicality

Although "[t]he concepts of commonality and typicality are

broadly defined and tend to merge . . . ," the Court will address

typicality separately.  <u>Barnes</u>, 161 F.3d at 141 (quoting <u>Baby Neal</u>, 43 F.3d at 56).  The typicality prerequisite considers whether "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a).  This inquiry "is intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented."  <u>Baby Neal</u>, 43 F.3d at 57.  However, the typicality requirement "does not mandate that all putative class members share identical claims."  <u>Barnes</u>, 161 F.3d at 141. Indeed, it is well settled that "'[f]actual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory.'"  <u>Id.</u> (quoting Newberg on Class Actions § 3.15, at 3-78).

Typicality requires that the named plaintiffs, by proving their claim, also prove the claims of the proposed class members. To put it differently, the named "plaintiff[s'] claim[s] cannot be so different from the claims of absent class members that their claims will not be advanced by [the named] plaintiff[s'] proof of [their] own individual claim[s]."  <u>Deiter v. Microsoft Corp.</u>, 436 F.3d 461, 466-67 (4th Cir. 2006).  Accordingly, dispositive issues of fact or law that are specific to the named

plaintiffs will normally defeat the typicality requirement.

Here, Plaintiffs' claims are not typical of the proposed class insofar as they do not share a common injury.  Because Plaintiffs Victor and Kathleen Opperman ultimately recovered the full value of their loss, the only injury they experienced from Allstate's deflated estimate was the burden of disputing the estimate.  The Court does not doubt that this burden presents a cognizable injury; Plaintiffs Victor and Kathleen Opperman may be entitled to recover for their costs, such as the retention of a licensed public adjustor, an attorney, and a neutral appraiser, as well as for living expenses incurred during the prolonged dispute.  But the only class members who share this injury are those who, like the Oppermans, successfully challenged Allstate's initial estimate.  Class members who brought an unsuccessful challenge,[8] and those who, like Plaintiff Murray, never disputed Allstate's estimate, do not share a common injury with Plaintiffs Victor and Kathleen Opperman.

Similarly, Plaintiff Murray's injury falls short of being typical of the class.  Armed with the knowledge that Allstate's estimate was low, Plaintiff Murray chose not to raise a dispute and accepted payment based upon the estimate.  Because Plaintiff

---

[8] Any number of reasons may account for why a challenge might have been unsuccessful, including the determination that the Allstate estimate was correct or a procedural failure such as bringing the challenge after the applicable 180-day period had expired.

Murray voluntarily acceded to the Allstate estimate, it is unclear whether she experienced any injury at all.[9]  To the extent that receipt of payment based upon a deficient estimate constitutes an injury, however, the injury is shared only by class members who (1) did not dispute (or successfully dispute) the estimate, and (2) whose loss value in fact exceeded the amount of Allstate's estimate.

As to this second category, Plaintiffs contend that all class members, ipso facto, received deflated estimates.  Starting from the premise that Allstate adopted the Home Depot pricing scheme in order to produce lower estimates generally, Plaintiffs have surmised that all class members received estimates that undervalued their loss.  (Pl.s' Repl. Br. 10-11 ("[E]very dwelling loss estimate was lower than it should have been . . . .").)  Plaintiffs' conclusion does not follow from their premise,

---

[9] It is not known why Plaintiff Murray opted not to dispute the estimate.  See supra note 5.  However, if she acceded to the estimate because she was content with it (because, say, she did not want to go to the trouble of rebuilding her home or, alternatively, she simply did not want to be troubled with having to raise a dispute), then she experienced no injury.  In other words, Plaintiff Murray's knowing choice to accept payment for less than her loss was worth may vitiate Allstate's responsibility for underpaying her.  See Samuel Williston & Richard A. Lord, 14 Williston on Contracts § 40.02 (4th ed. 2000) ("If a contract obligee accepts, in satisfaction of the obligor's duty, a performance offered by the obligor that differs from what is due, the duty is discharged.  Thus, if the obligor offers a performance that differs from what is due in full or partial satisfaction of his or her duty, the obligee need not accept it, but if the obligee does accept it, the obligor is discharged . . . ." (citing Restatement (2d) of Contracts § 277(1))).

13

however.  Although Allstate may have adopted the Home Depot
scheme to produce lower estimates in the aggregate, it does not
follow that _every_ Home Depot pricing estimate was necessarily
lower than it would have been using the preexisting price
database.  Furthermore, even if it were true that all Home Depot-
based estimates were lower than they otherwise might have been,
it is still likely that some estimates correctly approximated, or
even overestimated, certain claimants' loss value.  In other
words, even if most claimants received undervalued estimates, it
is likely that some unknown portion of claimants -- perhaps even
a substantial number -- received estimates that accurately
approximated their actual loss value (that is, their actual cost
of repair).[10]  This is particularly likely because the
irregularities that resulted from the imperfect mapping of Home
Depot prices onto the preexisting price database -- such as the
use of preexisting (non-Home Depot) prices for supporting
materials and the averaging of certain regionally variable Home
Depot prices -- likely produced some estimates that _exceeded_ the

_____

[10] Plaintiffs insist that all Allstate claimants received
undervalued estimates because the Home Depot pricing method
always produced estimates lower than the more reliable "MS/B"
(Marshall Swift & Boech) pricing method.  However, the relevant
comparison is not between the Home Depot and MS/B methods, but
between the estimates produced by the Home Depot method and
claimants' _actual loss value_ (that is, their actual cost of
repair).  Even if it were true that the Home Depot method
estimated a claimant's loss value at an amount lower than the
MS/B method would have, both methods could have produced
estimates higher than a claimant's actual repair cost.

14

actual cost of Home Depot materials.[11]  In short, to determine
whether a claimant received payment based upon a low estimate
requires an <u>individualized</u> <u>comparison</u> of what his or her loss was
worth with the amount Allstate ultimately paid on the claim.

If the Court were to certify the class Plaintiffs propose,
then claimants who received payment based upon an accurate
estimate -- that is, claimants who got precisely what they
bargained for -- would be grouped together with claimants who
were underpaid for the value of their loss.  Moreover, if the
Court were to certify the class Plaintiffs propose, then
claimants, like Plaintiff Murray, who opted to settle for the
estimated loss value amount rather than raise a dispute, would be
grouped together with claimants who, like Plaintiffs Victor and
Kathleen Opperman, chose to challenge the estimate.  Finally, if
the Court were to certify the class Plaintiffs propose, then
claimants like Victor and Kathleen Opperman who successfully
challenged Allstate's estimate would be grouped together with
claimants whose challenge was, for whatever reason,

_____

[11] Plaintiffs have suggested that even if Allstate's
estimates did accurately reflect Home Depot retail prices, the
estimates were still deficient insofar as Home Depot prices are
lower than the market average.  The fact that Home Depot prices
may be lower than those of other vendors, however, is only
relevant for those few claimants without access to a local Home
Depot store.  Claimants whose estimates accurately reflected (or
exceeded) the aggregate cost of Home Depot materials to repair
the loss, and who had ready access to a Home Depot store,
experienced no injury.

unsuccessful.[12]  Given the extraordinary variability within the
proposed class, Plaintiffs cannot satisfy Rule 23(a)'s
requirement of typicality.

Plaintiffs fall short of being typical of the class for an
additional reason:  Their cases are uniquely vulnerable to fact-
specific defenses.  First, as discussed above, Defendants will
argue at trial that Plaintiffs Victor and Kathleen Opperman have
no damages because they ultimately received the full value of
their loss in spite of the deficient initial estimate.  See
Franulovic v. Coca-Cola Co., No. 07-539, 2009 WL 1025541, *4
(D.N.J. Apr. 16, 2009) (explaining the New Jersey Consumer Fraud
Act's requirement that plaintiffs establish an "ascertainable
loss").  Second, Defendants will argue at trial that Plaintiffs
Victor and Kathleen Opperman cannot establish the element of
causation, see id., since their post-estimate dispute largely
revolved around the scope of their loss and methods of repair,
not Allstate's method of calculating materials costs.[13]  Third,

---

[12] See supra note 8.

[13] As the Court has explained, the only injury Plaintiffs
Victor and Kathleen Opperman experienced was the burden of
disputing Allstate's estimate.  If, however, the Oppermans would
have experienced this same injury regardless of Defendants'
alleged misconduct, then the Oppermans will not be entitled to
recover for the misconduct.  Because the misconduct alleged here
is Allstate's deficient scheme for valuing materials and remove
operations, the fact that Plaintiffs may have incurred the
burdens of disputing Allstate's estimate as a result of other
objections is certainly material.

Defendants have stated that the element of causation will present
a significant impediment to Plaintiff Murray's recovery as well,
since she is now severely mentally impaired and will not be able
to establish her reasons for accepting the Allstate estimate
without dispute.  In short, these class representatives present
far too many potentially dispositive unique considerations to
satisfy the requirement of typicality.

### 4.  Adequacy of Representation

The final prerequisite under Rule 23(a), adequacy of
representation, questions whether "the representative parties
will fairly and adequately protect the interests of the class."
Fed. R. Civ. P. 23(a).  This requirement "depends on two factors:
(a) the plaintiff's attorney must be qualified, experienced, and
generally able to conduct the proposed litigation, and (b) the
plaintiff must not have interests antagonistic to those of the
class."  Hoxworth v. Blinder, Robinson & Co., Inc., 980 F.2d 912,
923 (3d Cir. 1992) (internal citation omitted).  Unlike the other
requirements, when it comes to adequacy, "[t]he party challenging
representation bears the burden to prove that representation is
not adequate."  In re Prudential Ins. Co. of America Sales
Practices Litigation, 962 F. Supp. 450, 519 (D.N.J. 1997).

Here, there appears to be no dispute as to the qualification
of counsel for the proposed class.  The Court has no reason to
doubt that "counsel for [P]laintiffs are comprised of nationally

recognized class action counsel, as well as counsel expert in insurance coverage and bad faith claims." (Pl.s' Br. 40.) However, the parties do dispute the second part of the adequacy requirement, which concerns Plaintiffs themselves. Specifically, Defendants argue that Plaintiff Murray, who apparently suffers from severe dementia and brings this action through her son, holder of her power-of-attorney, cannot be an adequate class representative.

The Court is indeed troubled by Plaintiff Murray's condition, as it has no way of assessing whether she possesses "the ability and the incentive to represent the claims of the class vigorously . . . ." Hassine v. Jeffes, 846 F.2d 169, 179 (3d Cir. 1988); see also Hanson v. Acceleration Life Ins. Co., No. 97-152, 1999 WL 33283345, *11 (D.N.D. Mar. 16, 1999) ("[T]he implications of plaintiffs' old age and/or ill health on their ability to vigorously and competently prosecute a class action are of some concern to the Court."). If it turns out that Plaintiff Murray's testimony at trial is necessary to establish whether she knew that the Allstate estimate was low, or why she declined to dispute the Allstate estimate (facts vital to proving causation and damages), it is doubtful that she will be able to provide such testimony. Compare Hanson, 1999 WL 33283345, *11 (doubting the lead plaintiffs' adequacy because their "ability to testify and actively participate may become more important as

18

trial approaches"). Although the Court is hesitant to rule that Plaintiff Murray is an inadequate class representative solely by virtue of her mental incapacity -- certainly, the Court will <u>not</u> rule that a person of diminished mental capacity can never be an adequate class representative -- the Court cannot find on the record before it that Plaintiff Murray is an adequate representative in spite of her mental incapacity. Accordingly, even if Plaintiffs could satisfy the typicality prerequisite, Plaintiff Murray would not be an adequate representative.

### B.   Rule 23(b) Requirements

Having found that Plaintiffs have not met the prerequisites for class certification set forth in Rule 23(a), the Court need not address the requirements of Rule 23(b). In the interest of completeness, however, the Court will briefly discuss the Rule 23(b) standard. Pursuant to this section, a plaintiff seeking class certification must demonstrate that certification is appropriate under part (b)(1), (b)(2), or (b)(3). Here, Plaintiffs argue only that certification is proper under part (b)(3), which provides that:

> A class action may be maintained if . . . the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Fed. R. Civ. P. 23(b)(3). In other words, Rule 23(b)(3) requires both that matters shared by all class members predominate over

particularized concerns, and that a class action provides a preferable vehicle for adjudicating the controversy.

### 1.   Predominance

Turning to the first part of Rule 23(b)(3), the "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Products, Inc. v. Windsor, 521 U.S. 591, 623 (1997) (citing 7A Wright & Miller at 518-519).  The Court recognizes that "the presence of individual questions does not per se rule out a finding of predominance."  In re Prudential Ins. Co. America Sales Practice Litigation Agent Actions, 148 F.3d 283, 315 (3d Cir. 1998).  However, certification under Rule 23(b)(3) is inappropriate "if the main issues in a case require the separate adjudication of each class member's individual claim or defense . . . ."  7AA Wright & Miller § 1778, at 134.  This is because "when individual rather than common issues predominate, the economy and efficiency of class-action treatment are lost and the need for judicial supervision and the risk of confusion are magnified."  Id. at 141.  Because the requirements, in Rule 23(a), of commonality and typicality, are similar to (but less rigorous than) Rule 23(b)(3)'s predominance inquiry, Courts often discuss them together.  See, e.g., Georgine v. Amchem Products, Inc., 83 F.3d 610, 626 (3d Cir. 1996), aff'd 521 U.S. 591 (1997). Here, the obstacles preventing Plaintiffs from satisfying the

prerequisite of typicality also prove fatal to the requirement of predominance.

In <u>Amchem</u>, the Third Circuit held that concerns of individual class members predominated over classwide questions, because of the significant variability of the injury suffered by class members.  <u>See</u> <u>id.</u> (holding that class members suffered "different [injuries], for different amounts of time, in different ways, and over different periods").  Here, too, the injury suffered by class members varies widely.  Because of Allstate's faulty estimates, some class members received payments to settle their claims that significantly undervalued their loss, while others likely received payments that accurately approximated (or even overvalued[14]) their loss.  Some class members, like Plaintiffs Victor and Kathleen Opperman, received the full value of their loss after disputing the deficient estimate -- for them, the only injury suffered was the burden of bringing a dispute.  While the Oppermans' loss value was ultimately determined by a third-party appraiser, some claimants, despite disputing Allstate's estimate, may ultimately have agreed

---

[14] Some record evidence suggests that certain Home Depot prices were actually higher than the prices in Allstate's preexisting database.  (Kost Dep., Mar. 18, 2009, 65:14-24 [Def.s' Ex. 41].)  Although Allstate may have adopted the Home Depot pricing method to depress its estimates, it is likely that some small fraction of Allstate claimants actually received higher estimates using the Home Depot method than they otherwise would have.

to an award that still undervalued their loss, thereby suffering both the burden of raising a dispute and insufficient payment on their claim.  Still other class members, like Plaintiff Murray, may have chosen to accept the Allstate estimate without any dispute.  Some of these class members, like Plaintiff Murray, may have known that the estimate was low, but, for whatever reason, opted not to dispute it nonetheless.  It is doubtful that these claimants suffered any injury at all.  Still others may have accepted the estimate not knowing that it was low, and may ultimately have expended their own resources on repairing their loss.  In the final analysis, whether each class member suffered an injury, what injury he suffered, and the extent of his injury, can be determined only through a case-by-case inquiry.

Despite this variability, Plaintiffs maintain that the claims of Allstate policyholders are well suited for class adjudication, because Allstate's misconduct applied generally to all claimants.  The predominance requirement demands more, however.  To establish a claim under the New Jersey Consumer Fraud Act, Plaintiffs must prove the elements of unlawful conduct, ascertainable loss, and causation.  <u>Franulovic</u>, 2009 WL 1025541, *4.  Here, whether Allstate claimants suffered an ascertainable loss depends upon such particularized considerations as whether the amount paid by Allstate to settle a claim was sufficient to cover the repairs, whether the claimant

22

acceded to the Allstate estimate, and whether the claimant incurred expenses in disputing the estimate. Furthermore, to prove causation, Plaintiffs must show that Allstate's misconduct brought about the loss. <u>See</u> <u>id.</u> If, however, some class members accepted payment based upon Allstate's estimate for reasons other than Allstate's misconduct -- take, for example, a claimant who, in the interest of convenience, would have accepted any amount paid on his claim -- the element of causation will vary within the class.[15] Finally, Plaintiffs raise a common-law contract claim, alleging that Allstate's purposefully deflated estimates amounted to performance of the insurance policy in bad faith. Proof of this claim, too, will vary among class members, as some claimants undoubtedly received the full benefit for which they bargained -- that is, payment for the full value of their loss -- while others acceded to Allstate's performance. <u>See</u> <u>supra</u> note 9. Accordingly, Plaintiffs cannot satisfy the predominance requirement.

### 2. Superiority

For the same reasons, class litigation is not the superior means of adjudicating Plaintiffs' claims. The named Plaintiffs will not, by proving their claims, also prove the claims of all class members, and it is simply not practicable to adjudicate

---

[15] A further concern regarding the element of causation is raised at, <u>supra</u>, note 13 and accompanying text.

this matter with "countless mini-trials to determine . . . proof of each . . . element[] and defense[] . . . ." <u>Johnston</u>, 265 F.3d 194.  Furthermore, since class members' damages will vary widely, those who suffered a greater injury have a strong interest in prosecuting their own actions.  <u>See</u> Fed. R. Civ. P. 23(b)(3)(A); <u>see also</u> <u>Glazer v. Abercrombie & Kent, Inc.</u>, No. 07-2284, 2008 WL 4853641, *4 (N.D. Ill. Nov. 10, 2008) ("Large damage claims also increase the parties' interest in individually controlling the prosecution and defense of separate actions.").  Accordingly, individual suits provide a preferable mechanism to adjudicate these claims.[16]

### C.   Motion to Seal

Finally, Defendants have moved to seal various documents filed as exhibits in connection with the motion for class certification, pursuant to Local Civil Rule 5.3(c), because said documents contain purportedly confidential or proprietary

---

[16] The Court finds that the other two factors set forth in Rule 23(b)(3) -- pending litigation and forum choice -- are not relevant here.  <u>See</u> <u>Rowe v. E.I. duPont de Nemours and Co.</u>, No. 06-1810, 2008 WL 5412912, *21 (D.N.J. Dec. 23, 2008) (considering only two of four factors).

This Opinion has not entertained much discussion about the proposed subclass, namely, claimants who received estimates without a corresponding "remove" line-item for each "replace" operation.  The same deficiencies relevant to the proposed class also apply to this subclass.  In particular, a claimant who was able to repair his loss for an amount equal to or less than the total Allstate estimate -- regardless of whether the estimate properly calculated remove operations -- suffered no injury.

information.

The Court begins its analysis with the strong presumption favoring the "public right of access to judicial proceedings and records." In re Cendant, Corp., 260 F.3d 183, 192 (3d Cir. 2001).  To overcome this presumption, the movant must establish "good cause" for the protection of the material at issue. Schatz-Bernstein v. Keystone Food Products, Inc., No. 08-3079, 2009 WL 1044946, *1 (D.N.J. Apr. 17, 2009) (citing Securametrix, Inc. v. Iridian Technologies, Inc., No. 03-4394, 2006 WL 827889, *2 (D.N.J. Mar. 30, 2006)).  To establish good cause, the movant must show that disclosure will cause a "clearly defined and serious injury to the party seeking closure." Id.  The particularity of the showing required is set forth in Local Rule 5.3(c), which demands that a motion to seal describe: "(a) the nature of the materials or proceedings at issue; (b) the legitimate private or public interest which warrant the relief sought; (c) the clearly defined and serious injury that would result if the relief sought is not granted; and (d) why a less restrictive alternative to the relief sought is not available." Loc. Civ. R. 5.3(c).

Defendants have argued that certain documents containing confidential business information should be sealed, as public availability will hinder Allstate's market competitiveness.  The documents supposedly in need of protection reveal information

25

about Allstate's past corporate decisions and methods of adjusting claims that Allstate no longer employs.  For example, the document "Structural Estimating Software Initiative" [Pl.s' Ex. 17] is a PowerPoint presentation dated March 19, 2001, discussing Allstate's decision to change the software it uses to estimate the loss value of claims and the integration of Home Depot prices into that software.  The document "Home Depot Alliance – Strategic Overview" [Pl.s' Ex. 4] describes the development of Allstate's relationship with Home Depot and outlines the benefits to Allstate of the relationship.  While maintaining the confidentiality of these documents may have been important during the course of Allstate's relationship with Home Depot, that business relationship ended in 2004, and Allstate has not used the Home Depot pricing method since.  (McGillivray Letter, May 1, 2004 [Pl.s' Ex. 14].)  Although Allstate undoubtedly has good reason to prefer that these documents not become public, Allstate's continued insistence today that the confidentiality of these documents is imperative -- five years after the termination of its business relationship with Home Depot -- lacks credibility.  At the very least, these documents' age and attenuated bearing upon Allstate's current operations strongly mitigate Defendants' interest in maintaining their confidentiality.

Further casting doubt upon the weight of Allstate's interest

26

is the surprisingly broad sweep of Allstate's motion.  Allstate
seeks to seal 89 exhibits, including such documents such as
"Adjuster Talking Points" [Pl.s' Ex. 12], which merely describes
an Allstate business practice in generalized terms and includes
nothing more than the <u>public</u> <u>explanation</u> of that practice.  Many
of the documents included in Allstate's motion were apparently
created without any confidential intent.  (<u>See, e.g.</u>, Zuza
Letter, Apr. 23, 2004 [Pl.s' Ex. 46]; Q1 2003 Cost Database
Update, Apr. 21, 2003 [Pl.s' Ex. 49]; O&P Calibration
Facilitator's Guide [Pl.s' Ex. 57].)  Allegations of harm that
are "general, overbroad and conclusory" will not suffice to
establish a movant's genuine interest in averting disclosure.
<u>Schatz-Bernstein</u>, 2009 WL 1044946, *2.

     Weighing against Allstate's interest is the strong public
interest in the availability of these documents.  First, in light
of the Court's class certification ruling, Allstate policyholders
who may seek to bring individual actions arising from their
undervalued claims have a strong interest in accessing the
information contained in these documents.  <u>See, e.g.</u>, <u>Cipollone
v. Liggett Group, Inc.</u>, 113 F.R.D. 86, 90-91 (D.N.J. 1986)
(discussing the value of discovery from one case in subsequent
litigation).  Since the estimates received by Allstate claimants
are markedly opaque, documents produced in this litigation may
help policyholders to determine if the estimates they received

accurately measured the value of their losses.  Second, non-Allstate homeowners insurance policyholders have an interest in learning about the potentially unlawful method of estimating claims formerly used by Allstate, so they can assess whether their own insurance claims have suffered from similar sorts of misconduct.  Third, along with the public interest in the particular subject-matter of this litigation, the public maintains a strong general interest in the judiciary's transparency -- namely, promoting trustworthiness of the judicial process, curbing judicial abuses, and providing the public with a more complete understanding of the judicial system and the fairness it seeks to promote.

In short, Allstate has not overcome the strong public interest in transparent judicial proceedings by its mere generalized assertions (even if made by affidavit) that the materials are confidential and proprietary.[17]  The motion to seal will therefore be denied.

## CONCLUSION

Because the Court finds that Plaintiffs cannot satisfy the requirements for class certification set forth in Rules 23(a) and (b), it need not proceed to define with specificity the class to be certified.  See Fed. R. Civ. P. 23(c)(1)(B).

---

[17] The Court notes that none of the documents at issue here disclose truly proprietary information, such as source codes or algorithms applied to raw data.

28

For all of the reasons set forth in this Opinion, the motions for class certification and to seal documents will be denied.  An accompanying Order will issue herewith.[18]


Dated: November 13, 2009                s/Renée Marie Bumb
                                        RENÉE MARIE BUMB
                                        UNITED STATES DISTRICT JUDGE

---

[18] Defendants have also filed a motion to strike a certification of Plaintiffs' counsel, Michael DeBenedictis, [Dkt. Ent. 186:1] for its introduction of new and inadmissible evidence.  The certification at issue does not bear upon the rationale underlying the Court's class certification ruling. Thus, in light of the Court's other rulings, the motion will be denied as moot.